## A. L. WARD v. K. McKENZIE AND OTHERS.

1. A non-resident creditor is entitled to avail himself in our courts of the remedy by attachment of land in this State belonging to his debtor, although the debtor be himself a non-resident of this State. This right of non-resident creditors is not based on the principle of mere comity, when they are citizens of any of the States of the Union; but is secured to them by that clause of the United States Constitution which provides that " the citizens of each State shall be entitled to all the privileges and immunities of citizens in the several States."

2. The jurisdiction which our courts acquire by an original attachment against a non-resident debtor is not dependent upon the character of the demand, but is conferred by the levy of the attachment upon his property.

3. A non-resident creditor, who has recovered judgment in another State against his debtor, or who has otherwise a just demand against him, can maintain a suit in our courts to set aside a voluntary conveyance of

land in this State, made by his insolvent debtor, and to subject such land to the payment of his demand ; and it is not necessary that a creditor shall, before assailing such a conveyance for fraud, recover judgment in a court of this State upon his demand. (Denison, J., dissenting.)

4. It is competent in our courts, by reason of their mixed and plenary legal and equitable powers, for a creditor to maintain a single action against his debtor and his debtor's grantee of land under a fraudulent conveyance ; and in such suit to obtain service by attachment of the land, if the defendants are non-residents of the State ; and in one and the same judgment to recover upon his demand against his debtor and set aside the fraudulent conveyance, with decree for sale of the land to satisfy the demand. (Denison, J., dissenting.)

5. In a suit of the character just indicated, it was not error to exclude the testimony of the debtor and his wife, offered by the debtor's grantee and co-defendant, for the purpose of proving a valid consideration for the conveyance. The ruling in the case of Rogers & Oliver v. Patterson (31 Texas, 605,) that a party to the record is not a competent witness for his co-suitor, referred to and approved.

6. See opinion of Denison, Justice, for the reasons assigned by him for dissenting from the principal rulings of the majority of the court.

. ERROR from Colorado. Tried below before the Hon. I. B. McFarland.

This case presents questions of importance, both as principles of law and as matters · of practice. The most material facts are clearly stated in the opinion of the majority of the court, delivered by Mr. Justice Lindsay; but in view of the dissenting opinion of Mr. Justice Denison, it is proper to relate certain other matters not adverted to in the opinion of the majority.

. The defendant Samuel Ward, at his first appearance in the cause, on the first of November, 1859, excepted to the jurisdiction, because it appeared by the petition that all the parties to the suit, both plaintiffs and defendants, were non-residents of the State. But he also filed at the same time exceptions to the petition in the nature of special demurrers, together with a motion to quash the attachment, and with an answer on the merits, alleging

a full and adequate consideration for the conveyance to A. L. Ward.

At the same date, the defendant A. L. Ward, filed general exceptions to the petition, for insufficiency, accompanied by an answer, setting up the same consideration for the conveyance which was alleged by his father and co-defendant, Samuel Ward.

And, also, on the same day, the defendant Hughes, describing himself as a citizen of New York, appeared to the suit, and moved to quash the attachment, besides excepting to the petition on special causes of insufficiency, and then proceeding with an answer to the merits, disclaiming any beneficial interest in the land, but setting up that he held it in trust 'for his co-defendant, A. L. Ward, alleging that the conveyance to him by A. L. Ward was without the knowledge or privity of Samuel Ward, and solely superinduced by considerations of prudence, specifically detailed, wholly disconnected from the pecuniary liabilities of Samuel Ward.

At that and the succeeding Spring term, 1860, general continuances are entered, and there is no further notice of the cause until October, 1865, when it was again continued.

Nothing further of consequence was done until the Spring term, 1868, when the plaintiffs amended, and alleged that, notwithstanding the conveyance to A. L. Ward, and from him to Hughes, the land in question had all the time been and still was the property of Samuel Ward, and those conveyances were fraudulent contrivances to screen it from his creditors, and especially from the plaintiffs, who had been such creditors ever since 1849; that at the time the conveyances were made Samuel Ward was notoriously insolvent, and that fact was well known to all the defendants; and that certain notes of one Bowie, alleged by Samuel and A. L. Ward as the consideration paid by the latter to the former for the land, were not the property of A. L. Ward, but belonged to Samuel Ward, if they had any existence at all.

At this same term the plaintiffs filed exceptions to the depositions of Samuel Ward and Lucy A. Ward, his wife, which had been taken in behalf of A. L. Ward, and which seemed to be very material to his defense, as going far towards proving a full consideration paid by him to his father for the land in question. Besides exceptions to the manner in which the depositions were taken and returned, the plaintiffs objected on the further ground that by one of the answers it appeared that A. L. Ward was present at the taking of the depositions; but in these exceptions the competency of the witnesses was not called in question. At the trial, however, the depositions were objected to on the score of their incompetency as witnesses, and were excluded by the court on that ground; to which the defendants duly excepted.

At the Fall term, 1868, A. L. Ward pleaded in reconvention, claiming damages for the wrongful suing out of the attachment and consequent depreciation of his title, and for his outlays, etc. The plaintiffs filed exceptions to this plea in reconvention, and the plea was stricken out.

At the same term the defendants renewed their motions to quash the attachment, alleging as an additional ground that the attachment bond was void for want of seal or scroll. The plaintiffs excepted to this motion, because it was filed without leave of the court, because the original motion waived the defect in the bond, and because no sufficient notice of the motion had been given.

On the twenty-second of September, 1868, the cause seems to have come on for trial, and there is an entry that on that day the exceptions of the defendants to the jurisdiction of the court, and also their demurrers to the petition, were overruled, and that the depositions of Samuel Ward and wife were excluded; to all which the defendants excepted.

The next day the jury returned a verdict against Samuel Ward for $11,885 16, and that the land described in the petition was liable for the debt; whereupon, the court rendered judgment against

Samuel Ward for that sum, and decreed that the deed to A. L. Ward and his deed to Hughes be cancelled and annulled, and that the land be sold to satisfy the plaintiff's debt. Neither in the judgment and decree, nor anywhere preceding it, does any order quashing the attachment appear; but immediately following it, and as of the same date as the judgment, an entry appears, giving only the style of the case, with the words "attachment quashed" appended.

It has not been deemed necessary to insert the charges given and refused, because the rulings of this court are not predicated on those charges, but on the questions raised on the whole record.

The case is brought up by A. L. Ward upon writ of error.

*J. T. Harcourt* and *W. H. Goddard*, for plaintiff in error.— It is confidently asserted that the plaintiffs below could not contest the conveyances to A. L. Ward and Hughes—could have no right to drag them and their title into suit, until after having recovered a judgment in this State against Samuel Ward, and thereby obtained a lien on the land in dispute. As a legal proposition, this is almost too plain for argument.

The word, " creditors," as used in our statute of frauds and fraudulent conveyances, has the same signification that it has in all statutes *in pari materia*, from that of 13 Elizabeth down to that enacted in the last State admitted into the Union, and this signification has long been settled by the highest authority. " Voluntary conveyances cannot be set aside, except by creditors who have reduced their debts to judgment before the death of the party, for until that time they constitute no lien on the land." Story's Eq., § 375, and note on p. 40. " A creditor must have completed his title at law, by judgment and execution, before he can question the disposition of the debtor's property." * * * " Until he has established his title he has no right to interfere." * * * " Unless he has a certain claim upon the property of

the debtor he has no concern with his frauds." (Wiggins *et al.* v. Armstrong, *et al.*, 12 Johns., Ch. 144.)

It would be idle to multiply authorities. The principle is too clearly established to be disputed, that it is not creditors at large, but creditors who have a lien or claim upon the specific property, who are entitled to attack their debtor's conveyance of it as fraudulent.

The case at bar is virtually a proceeding on the part of the plaintiffs, as between them and A. L. Ward, to try the right of property in this land; and how can a creditor try the right of property, with his debtor's vendeee, upon the bare allegation that the vendor is his debtor, and before he has himself acquired any right or claim to the property in dispute, and how can he acquire such a right or claim, except by either a judgment, where that alone is a lien, or a judgment and execution levied, where the levy of an execution is necessary to give a lien?

Our reports teem with cases where the right of property has been tried between a debtor's vendee and the creditor, but they will be searched in vain for a single case, in which a creditor has proposed to "try conclusions" with the vendee, without having first acquired some claim upon the property himself.

Now, evidently, though the plaintiffs were judgment creditors of Samuel Ward, in the States of Louisiana and New York, they were not his judgment creditors in this State. Their foreign judgments gave them no lien on the land in dispute, and were, so far as the purposes of this argument are concerned—so far as affects the title to the land in question—of no more effect or avail than a due-bill or a store account.

Nor can it be claimed that the attachment (even though it had not been void, and quashed as such) served in lieu of a judgment lien on the land. A. L. Ward could have instituted a proceeding for the trial of the right to the land, when attached as Samuel Ward's, had he seen fit to do so. But that was his privilege, and

was a very different thing from being lugged into this suit against Samuel Ward. No one has before heard of an attaching creditor trying the right of property with the vendee before obtaining judgment against the debtor. To carry on the two proceedings in one suit, and thus make them "ride double," is an anomalous attempt in the courts.

It is unnecessary to pursue the argument. This court is asked to reverse the judgment of the court below, so far as it affects A. L. Ward, his right to the land, and the conveyances to him and Hughes, (the conveyance to Hughes being only in trust for A. L. Ward); and also to dismiss the suit as to Hughes and A. L. Ward.

This is the logical and legal consequence of the incurable defect in the plaintiffs' cause of action. They could not, on their own showing, have any right to call these parties into court, and there can be no reason for remanding the cause.

The remaining point in the case presents a very interesting and important question of practice in our courts. It arises on the competency of Samuel Ward as a witness in behalf of his co-defendant, A. L. Ward. Of his competency there would be no question, under the repeated decisions of this court, if the suit were only between the plaintiffs and A. L. Ward, to try the right of property in the land. Nor in this suit, as it now stands, is Samuel Ward incompetent as a witness, on the score of interest, as is quite clear without argument. If disqualified at all, then, it must be on the broad, bare ground, that, in no possible case, can a defendant be a witness in our courts for a co-defendant, if the plaintiff object, no matter though the defendants occupy antagonistic positions, and are, to all intents, opposite parties, with respect to the point to which the witness is called—the mere joinder of persons as co-plaintiffs or co-defendants, renders them incompetent witnesses for one another, though they may be used by the opposite party against one another.

This seems to have been held by this court in Rogers & Oliver v. Patterson, decided at the last Galveston term. But the point is considered still open for argument, by the courtesy of the court; and inasmuch as, in that case, the question was not argued in the brief of counsel, nor was its decision necessary to the disposition of the cause, (for the incompetency of the witness, on the score of interest, sufficed for the reversal of the judgment,) it is not doubted that the court will, in this case, come to the consideration of the question without any prepossession derived from the opinion in Rogers & Oliver v. Patterson.

Let it be granted, for the time being, that the admissibility of evidence in our courts is governed by the rules of the common law, as modified by our statutes. What, then, is the common law rule, as declared by the common law courts? The earlier cases, both English and American, went, no doubt, to the full extent of declaring a party to the record to be an incompetent witness in all cases. The declarations were sometimes based on the twofold ground of public policy and interest; and it afterwards came to be a matter of discussion, whether public policy, " irrespective of interest," was not and should not be the sufficient ground of exclusion. Gradually, however, eminent judges and enlightened courts ventured to question whether public policy had anything to do with the matter. If it had, the rule, it was claimed and conceded, was universal and inflexible; a merely nominal party, having no interest, and indemnified as to costs, must be rigorously excluded. But if public policy was not concerned—if interest alone determined the question—then parties might or might not be competent witnesses, according to the circumstances of the particular case. At last, public policy so completely failed to make good its claim as a just and rational ground of exclusion, that it came to be asserted by high authority that it never had been so regarded by the courts; that a witness had never in fact been rejected, except on the ground of interest. In the case of Worrall

v. Jones, 7 Bing., 395, Chief Justice Tindall, delivering the opinion of the court, said: "No case has been cited, nor can any be found, in which a witness has been refused upon the objection in the abstract that he was a party to the suit. On the contrary, many have been brought forward in which parties to the suit, who have suffered judgment by default, have been admitted as witnesses against their own interest; and the only inquiry seems to have been, in a majority of the cases, whether they were interested in the event or not; the admission or rejection of the witness has depended upon this inquiry."

So in Willings v. Consequa, 1 Pet. C. C. R., 301, Washington, J., treats the question as settled: "The general rule of law certainly is, that a party to a suit cannot be a competent witness. But it is equally so, that the interest which that party has in the event of the suit, both as to costs and the subject in dispute, lies at the foundation of the rule, and when that interest is removed the objection ceases to exist."

In Pipe v. Steel, 2 Q. B., 733, (2 Ad. & Ellis, 888,) Chief Justice Denman, referring to Worrall v. Jones, observed: "The objection that the witness is a party to the record, which prevailed in Brown v. Brown and Mant v. Mainwaring, has been deliberately overruled in Worrall v. Jones, a case of great authority, in which the Lord Chief Justice Tindall gave the unanimous judgment of the common pleas, that a party to the record may be examined as a witness, provided he is disinterested;" and the rule is affirmed, that a party may be a witness against his own interest.

Now, two things are to be here noted. The first is, that these later cases authoritatively settle what was the common law rule, as unmodified by any statutory enactment. The second is, that when the courts settled the principle that at the common law the admissibility of a party depended solely on the ground of interest, they first applied the principle in cases in which the witness was called by the opposite party, and did not himself object to testify;

XXXIII—20

perhaps, because it first arose in that way. But they did not stop here. Accordingly, we find both courts and commentators declaring it to be the rule at common law that " a party likewise who had ceased to be interested in the result might be called by his co-plaintiff or co-defendant. (I refer here, once for nearly all, to the multitude of cases collected in Cowen & Hill's and Edwards's Notes to Phillipps on Evidence, vol. 1, pp. 30, *et seq.*, and to the latest editions of the standard treatises on evidence.)

True it is that in most, indeed nearly all, of the numerous cases holding this doctrine, the party ceased to be interested in the suit through a default or a verdict, or a *nolle prosequi*, as to him, by which it may be claimed that he ceased, at the same time, to be a party to the suit. But this is not strictly so. Chief Justice Tindall speaks of a defendant, against whom a default has been taken, as still a party to the suit; a party to the record he most certainly is, and is so recognized by Greenleaf, (vol. 1, § 356,) as is also a defendant after verdict, in the case presently to be cited from 6 Monroe.

But let this be waived, and let it be conceded that, in the cases now referred to, the courts did regard the default, or the verdict, or the *nolle prosequi*, as detaching the party from the suit and the record, and in that way obviating the objection to his competency; still, what is important and significant is, that the reason assigned by these very courts why, in the cases under consideration, the objection was removed by the default, or the verdict, or the *nolle prosequi* is, that until then the party was interested in the event of the suit.

But there are cases that go still farther, and declare that at the common law a plaintiff may be a witness for his co-plaintiff, or a defendant for his co-defendant, where the party offered as a witness is not interested, and is merely a nominal party, as a trustee or administrator; even go so far as to assert that no case to the contrary can be found. (Lampton v. Lampton's heirs, 6 Monroe,

617 ; Patton's heirs v. Ash, 7 S. & R., 116 ; Heckert, admr., v. Haine, 6 Binney, 16 ; Keim v. Taylor, 11 Pa. State R., 163.) Now, a nominal party is as much a party to the record as a real party ; the only difference between them is in respect of their interest. So that these cases, and the courts which decided them, have reached the conclusion that it is interest alone, whether the witness is a party to the record or not, that determines his competency at the common law.

In Steele v. Phœnix Insurance Company, 3 Binney, 306, where a plaintiff, being disinterested, was admitted as a witness for his co-plaintiff, Tilghman, C. J., says : " It is true, indeed, that no instance has been shown of the plaintiff being received as a witness in an action at law in England. The fact is, that in almost every instance the plaintiff is interested either in the subject of the suit or in the costs, and therefore the conclusion may have been drawn without sufficient reflection, that in no case can he be a witness. The reason of the law is the life of the law. Now, what good reason is there why a man's testimony should be excluded, merely because his name is placed on the record as a party to the suit, in which he has no manner of interest ?"

But the reason for this relaxation in our courts rests on still broader ground, viz. : that they are not strict common law courts, but have blended law and equity powers and jurisdiction.

In equity, the rule is, and always has been, that the competency or incompetency of a party depends solely on his interest. "A plaintiff might obtain an order, of course, to examine a defendant, and a defendant a co-defendant, as a witness, upon affidavit that he was a material witness, and was not interested on the side of the applicant, in the matter to which it was proposed to examine him." "An order allowing a defendant to examine his co-defendant as a witness, would always be granted upon a suggestion that the party to be examined had no interest in the cause, leaving the question of interest to be settled on the hearing upon

the proofs." (Daniell's Ch. Pl. and Pr., Perkins's ed., p. 885 and note; 1 Smith's Ch. Pr., p. 459, note 1; 1 Greenleaf, § 361.)

The original adoption of this rule in chancery courts is, no doubt, owing to the same cause to which the relaxation of the rule in the common law courts is due, viz. : the greater complexity of suits, and the greater number and diversity of the relations existing among the parties to the record.

Yet even in equity courts, some relaxation of the rule is perceptible; for while it was long held that a defendant could avail himself of the testimony of a complainant only by a cross bill filed for the purpose, it is now held by high authority that there is no reason why a complainant should not be required to answer interrogatories propounded to him in a defendant's answer.

Upon principle, then, and apart from all authority, it might be confidently expected that our courts—taking into consideration the steady advance of the common law courts from the total exclusion to the almost unqualified admission of disinterested parties to the record, the uniform tendency of all legislation in the same direction, and even to the abrogation of all restrictions on the competency of witnesses, the liberal rule that has always prevailed in courts of chancery, and the fact that our courts take cognizance "of all suits, complaints and pleas whatever, without regard to any distinction whatever between law and equity"—would exercise, without hesitation, their rightful authority, and by making the admissibility of a party as a witness depend solely upon his interest, declare the rule of reason to be the rule of practice in the courts of this State.

But there is authority for this, if needed; for to this extent even the common law courts of Pennsylvania have gone, not on the ground that they had equity powers and jurisdiction, but on the far less solid and tenable ground that there were no courts of chancery in that State.    In Harte v. Heilner, 3 Rawle, 407, a plaintiff, after an assignment of all his interest, and the payment

of costs, was admitted as a witness for his co-plaintiff, in an action of assumpsit on a promissory note, the court saying that as there is no court of chancery in that State, "courts of law have been governed, not merely by the rules of law, but by those of equity and law combined." And in 3 Binney, before cited, the learned Chief Justice says : "The reason for admitting such evidence is much stronger here than in England. In this State we have no court of chancery," etc. How much more cogent the reason for the admission of such evidence in our courts, which exercise the powers and jurisdiction of courts of chancery as well as of law— and that not on different sides of the court, not in separate proceedings, but in every suit that is brought before them.

Here it may be well to consider, for a moment, the practical result of adopting a different rule. We find it stated that "the sturdy rejection of a party, though entirely disinterested, by the courts of New York, has operated to extend the jurisdiction of chancery there. In a cause by three persons as nominal plaintiffs, though only one was interested, tried before Cowan, J., at the Washington circuit, the defendant offered B., one of the plaintiffs, who was willing to be sworn as a witness against the real plaintiff. The latter objecting to this, and the witness being rejected, the chancellor sustained a bill, filed with the view to be relieved against the rule, and in his court gave the defendant the benefit of the more liberal rule which prevails there." (Norton v. Woods, 5 Paige, 249, cited in the note to Phillipps, at p. 34.) Now, by parity of procedure, should a defendant be rejected, in a case like the present, in our courts, solely because of his being a party to the record, his co-defendant, seeking his testimony, might file another suit in the same court, "with the view to be relieved against the rule;" and the court, in this second suit, having full equity powers, might give the applicant "the benefit of the more liberal rule which prevails in equity;" and yet the same court could not give the same relief in the first suit, in which, also, it

has and may exercise all judicial powers, "without distinction between law and equity." Would it not be better and more rational to avoid this multiplicity of suits, and allow the court to meet and remove the technical objection, the very moment it is interposed?

It is believed that the decisions of this court, so far as any inference can be drawn from cases not directly in point, are favorable to the adoption of the rule contended for. (Dial v. Crain, 10 Tex., 480, not excepted.) In that case the plaintiff, being an administrator, filed a release of all claims against the estate, (for commissions, etc.,) and offered himself as a witness for the estate. He was rejected; but the bill of exceptions did not show what was intended to be proved by his testimony, and the materiality of that testimony, therefore, did not appear. This was fatal to the appeal, as this court could not review the ruling of the court below. In addition to this, the court say that the administrator may have been interested, notwithstanding the release—he may have been personally liable for fees or costs, so that the court could not say that the release, of itself, removed the objection of interest. This was all that was necessary to dispose of the case. The opinion, however, refers in a general and summary way to the conflicting decisions with regard to the competency, as a witness, of a party to the record. It says: " The doctrine is not well settled whether a party to a suit can be allowed to testify in his own favor, in such suit, interest or no interest. In most cases administrators, executors, guardians and all other parties to a suit, in a fiduciary capacity, have been excluded. The general ground of rejecting them is, that, although not interested in the subject matter of the suit, they are nevertheless liable for costs personally. This is certainly resting the objection to the competency, upon the ground of interest." Again : " There is no doubt that the tendency of the decisions has, for many years, been to narrow down the distinction between the competency and credibility of witnesses, and, when there is any doubt as to the interest, to admit the evidence and let

the objection go to the credibility." The opinion further states that " in some cases the objection has been placed upon the naked ground" that the witness is a party to the record, and also notices " the tenacity " with which the objection has been adhered to, notwithstanding the general tendency of the decisions. "But in all the cases examined by us," say the court, " it was found that when a party to the suit, apparent upon the record, was received as a witness, he was called by the opposite party, and not by his own side of the question. The weight of the adjudged cases would sustain the objection to a party being a witness in his own behalf, although not interested, for even costs, in the result of the suit, personally, but on the naked ground of his being a party to the record of the suit, unless when he is willing to testify at the call of the opposite party.

It is not necessary to draw the distinction between Dial v. Crain, and the case at bar, that there the plaintiff volunteered to testify for the estate, while here the witness was called by his co-defendant to testify against his own interest. It need only be said that the opinion, delivered by Mr. Justice Lipscomb, rested securely on the insufficiency of the release and of the bill of exception, so that he did not go into a thorough examination of the question, whether the plaintiff was an incompetent witness, on the simple ground that he was a party to the record—as is clearly shown by his statement, that " in all the cases examined by us, it was found that where a party to the suit, apparent on the record, was received as a witness, he was called by the opposite party." The case not requiring it, he alludes neither to the equity rule, nor to the propriety of the application of that rule in our courts, though his own leaning in favor of making interest alone the test of competency, as in equity, is believed to be clearly apparent in the opinion.

But in Ware v. Bennett, 18 Texas, 794, Mr. Justice Wheeler, after referring to the conflicting decisions in the common law

courts, and to the case of Worrall v. Jones, as putting public policy entirely out of view, and resting the rule upon interest alone, says : " In chancery, a party totally disinterested is constantly received as a competent witness. It would seem on principle that the more liberal rule of courts of equity ought to obtain in courts of this State." Farther on, speaking of Parsons v. Phipps, 4 Texas, 341, he says, " apart from the consideration that the rule maintained by this decision seems supported by the better reasons, especially considered in reference to our practice," etc. True, in both of these cases, (Ware v. Bennett and Brown v. Phipps,) the party was called by the opposite side. But " the more liberal rule of courts of equity " is not restricted in its application to such a case. It allows a defendant to testify for his co-defendant, when not disqualified by interest ; and the reasoning of the learned judge is just as pertinent and forcible to support the adoption by our courts of " the more liberal equity rule," in its wider as in its narrower application.

*W. G. Webb*, for the defendants in error.—Samuel Ward was not a competent witness ; and this, both because he was a party to the suit and interested in its result. (Commonwealth v. Marsh, 10 Pick., 57 ; Haswell v. Bussing, 10 John. R., 128 ; Sharp v. Thatcher, 7 Mass. R., 398 ; Fox v. Whitney, 16 Id., 118 ; Adams v. Leland, 7 Pick., 62 ; Benjamin v. Coventry, 19 Wend., 353 ; Fort v. Gooding, 9 Barb. R., 371 ; Owings v. Emery, 7 Gill, 405 ; Patterson v. Cobb, 4 Florida, 481 ; Oakley v. Aspinall, 2 Sand. R., 7 ; 4 Wend., 453 ; 12 Mass. R., 358 ; 6 Monroe, 616 ; 5 Id., 212 ; 2 J. J. Marshall, 28 ; 7 Bing., 395 ; 1 Phillips, ed. of 1859, p. 29, note 19, in which many authorities are collated ; Dikes v. Miller, 24 Tex. R., 425 ; Calhoun v. Wright, 23 Tex. R., 524 ; Gill v. Campbell, 24 Tex. R., 405 ; Rogers & Oliver v. Patterson, Galveston term, 1869.)

The same rule which excluded Sam. Ward also rendered his

wife, Lucy A. Ward, an incompetent witness. (Sedgwick v. Watkins, 1 Ves., 49; 13 Ves., 144; Langley v. Fisher, 5 Beav., 443; O'Connor v. Majoribanks, 4 M. & G., 443; Aveson v. Kinnard, 6 East, 192; Barnes v. Comack, 1 Barb., 392; Cook v. Grange, 18 Ohio, 526; Alban v. Pritchett, 6 Term R., 620; Denn v. White, 7 Term R., 112.)

Also, see every standard work on evidence—Greenleaf, Phillips, Starkie, etc., etc., title, husband and wife.

The case of Rogers & Oliver v. Patterson, decided at Galveston, in February 1869, is conclusive of this case.

LINDSAY, J.—The principal question raised by the pleadings and the evidence in this case is, whether a non-resident creditor, who has obtained his judgment in another State, can successfully assail and set aside a voluntary conveyance, made by his insolvent debtor, of his lands in this State, and subject them to the payment of his demand.

In April, 1849, the plaintiffs, now defendants in error, recovered a judgment in the State of Louisiana against Samuel Ward, as the indorser of a bill of exchange. On this unsatisfied judgment, in Louisiana, they again recovered a judgment in New York, in May, 1858. The demand still remaining unsatisfied, the judgment debtor in New York, in April, 1856, made a voluntary conveyance to his son, of six hundred acres of land which he owned in Texas; and the son, pending the suit in New York, in October, 1857, made a conveyance, without consideration, of the same land to a stranger, charged with notice of all the facts connected with the alienation of the land and the indebtedness of the judgment debtor of the defendants in error.

By an original attachment, sued out in the county of Colorado of this State, where the six hundred acres of land were situated, the defendants in error commenced their suit upon their judgment obtained in the State of New York. This suit was commenced on

the twenty-third of March, 1859, and was finally decided by the district court on the twenty-third of September, 1868.     This judgment is brought here for revision by writ of error.

It may be assumed that whatever privilege, benefit or advantage, a resident citizen may derive from the *provisional* remedy of attachment, which has been created by the attachment law of this State, is equally accessible and available to any citizen of any State of the United States, because the Constitution of the United States has declared, that " the citizens of each State shall be entitled to all the privileges and immunities of citizens in the several States."    All the *civil* rights and obligations conferred or imposed by the laws of a State, upon its own citizens, may be enjoyed and must be submitted to by the citizens of other States, whenever the action of a State tribunal is invoked for their adjustment, or enforcement.    It is not a matter of mere comity among States, but it is a constitutional guaranty.

Whatever of right, then, exists in a resident citizen to proceed by attachment upon such a state of facts as is presented by this record, exists, also, in any citizen of the United States who may seek the interposition of the courts here to enforce his just or equitable demands.    If, therefore, a resident citizen, who holds a just claim against a non-resident or absent debtor, can proceed by attachment against such non-resident or absent debtor, whatever be the character of the claim, provided it be a just one; so may a non-resident creditor proceed in the same way, when he shall have complied with the requisitions of the attachment laws.    The same verification by oath of the amount and justice of the demand is necessary in either case, with a statement of the existence of any one of the causes enumerated in the statute, to warrant the issuance of the attachment.    But then, in either case, there must be property of the absent debtor within the territorial jurisdiction of the court to sustain the proceeding.    If neither the person, nor any property of the defendant be found within the ter-

ritorial limits of the jurisdiction of the court, the whole proceeding *de integro* is a nullity.    There must either be the person of the defendant or the property of the defendant to confer jurisdiction upon the court.    This is indispensable, whether the proceeding be by judicial or original attachment.    In a judicial attachment, upon suit instituted, the citation must be returned "not found" to entitle the party to the writ.    If no property be found in the jurisdiction and taken into the custody of the law, by virtue of the writ, no valid judgment can be rendered in the cause.    Such a judgment would be an absolute nullity, both at home and abroad.    It is obvious, therefore, that it is not the character of the claim or demand which confers jurisdiction upon the court in proceedings by attachment.    It is the writ of attachment itself, when served, demonstrating the existence of property belonging to the defendant within the *territorial* jurisdiction of the court, which confers the *actual* jurisdiction in the particular case.    The potential jurisdiction of the court exists over all *civil* rights and obligations which arise within its territorial jurisdiction; but that jurisdiction, to become actual, must be acquired by some step taken by an actor in some suit or proceeding in the court.    This may be done as well by original attachment as by an ordinary petition filed, and a citation issued, served and returned by the proper officer.    When the citation is returned "executed" upon the person in the one case, and the writ of attachment is returned "levied" upon the property in the other, the potential jurisdiction is then acquired; and the subject matter, or the *lis mota*, then being under the control of the court, whether it be of legal or of equitable cognizance, according to the laws of Texas, the court has full power to deal with it, and dispense justice according to the right of the case.

But it is plausibly and ingeniously argued, that before the voluntary conveyance can be contested by the creditor, he was bound to get a judgment, upon his New York judgment, in this State,

before he could obtain a *lien* upon the land attached; and in support of this view, the opinions of Justice Story and Chancellor Kent, two of the ablest expounders and brightest luminaries of the law on this continent, it is readily conceded, are relied upon. But if this conclusion be correct, it will forever preclude a non-resident creditor from subjecting the property of a non-resident debtor, situated in a State different from his domicile, to the payment of his debts, however ample that property might be for that purpose. For it is by the attachment alone that the local court could ever acquire jurisdiction to give him a judgment upon his just demand, whether the demand exist in the form of bonds, notes, judgments or other evidences of indebtedness. The local court can give no judgment upon a mere order of publication against a non-resident, without property within its local limits to confer jurisdiction. Hence the requirement, in such a case, to obtain a judgment here first, and then proceed to assail and set aside the voluntary conveyance, is altogether illusory. It is keeping the word of promise to the ear, and breaking it to the hope. No judgment can be had without the attachment. The attachment puts the specific property *in custodia legis*, under the control of the court, by the diligence of the creditor. Then, having jurisdiction of the subject, like all courts of equity, it has full power to grant the relief sought. Once having the jurisdiction, no matter how acquired, it never can be imputed to a court of equity, as acting inequitably, to compel a party to be just before he becomes generous, even independent of the statute of the 13 Elizabeth, which might even have been done by a common law court, as was strongly intimated by Lord Mansfield; fraud, whether actual or constructive, being a matter of concurrent jurisdiction in courts of law and in courts of equity.

There are different kinds of *lien* recognized in the jurisprudence cf most, if not all of the American States—the common law *lien,* which is the right to retain the possession of the property of

another until some claim, or charge upon it, is satisfied ; an equitabe *lien*, which may exist independent of the actual possession of the property, as in the case of a vendor's *lien*, and certain statutory *liens*, given to mechanics and others by express legislative enactment.    Now, although an attachment may be (which is not conceded here) technically a *lien* upon the property of the debtor, yet, when that property has been attached as his property, it is then in the custody of the law, and no ground can be discovered in law, logic or reason, why, upon an allegation of insolvency, the voluntary conveyance of it may not be pronounced by the court, fraudulent and void as to existing creditors at the time of conveyance, and the property subjected to the payment of a just demand. The reference to Story's Eq. Jurisprudence, § 375, by no means sustains the proposition that in this country the creditor must obtain a *lien* upon the land of the debtor, by judgment, before he can seek the aid of a court to set aside a voluntary conveyance. That is only the English doctrine applied to, and deduced from, the English statute against fraudulent *devises*, which, not embracing fraudulent conveyances in its provisions, the courts of that country have adjudged that a voluntary conveyance, made in the lifetime of the intestate, cannot be set aside, except by those who have reduced their debts to judgment before the death of the party.    Although this be the English doctrine, the author, in the very next paragraph, points out the difference between the English and American doctrine, growing out of the fact that lands are universally, in America, assets for the payment of debts.    But in England lands can only be so used by the process of *elegit*, which places it in the possession of the creditor, to be held by him, very much as the mortgagee holds the land of the mortgagor, till the rents and profits shall satisfy and extinguish the indebtedness.

The case of Wiggins and others v. Armstrong and others, Johns. Ch., 149, is not a parallel case with the present.    It was not a proceeding against an absent or absconding debtor.    Nor

was it a proceeding by attachment. It was an attempt to call in the aid of a court of equity to a court of law before it was manifest that the party was really entitled to the remedial agency of either. Or it was a mere attempt to shift the forum of trial. Or, in the expressive language of the learned attorney, it was carrying on two proceedings, and attempting to make them " ride double," which, it is conceded, is anomalous, and repugnant to every system of pleading. In this case, the party swears to a just indebtedness and obtains his attachment, which was levied on the land as the property of the debtor ; and it was thus held *in custodia legis*, which, although it does not exactly correspond to a *lien*, in the opinion of Justice Story, yet, according to his admission, it operates as " a contingent and conditional charge until the judgment and levy." (*Ex parte* Foster, 2 Story's Reports, 131.) This court, however, has distinctly recognized the doctrine in the case of Meuley v. Zeigler, 23 Texas Reports, that an attachment *does* create a *lien* upon the specific property attached. The *levy* of the attachment confers jurisdiction upon the court, and operates as a *lien* until judgment can be had upon the justice of the demand ; and if any obstructions lie in the way of the execution and sale of the property in satisfaction of the judgment, the court, as a court of equitable as well as of common law cognizance in the same suit, can remove all such obstructions without compelling parties to circuity of action for the final adjustment of their rights.

It is needless to refer to decisions of the various State courts to support the doctrine, that the *levy* of an attachment upon the property of a debtor operates as a *lien*. Nearly all, at least a large majority of them, distinctly recognize it. And if it operates as a *lien*, it will hold it till judgment and until execution can issue ; and if it be in a forum, which dispenses both law and equity in the same suit, every obstacle and obstruction to the satisfaction of the judgment, to the full extent of the property attached, can be removed out of the way, (See Scott v. McMillen, 1 Littell's Ky. Reps., 302.)

This was a voluntary conveyance of an insolvent debtor, as established by the proof upon the trial. According to the better doctrine and construction of the statute against fraudulent conveyances enunciated by Chancellor Kent, it was constructive fraud upon existing creditors —legal fraud—an inference of law, from the mere fact of indebtment at the time of the conveyance. But if this stern and rigid rule of the learned Chancellor, which is the better guarantee of private and social integrity, pushes the doctrine beyond the qualification of *intention* in the grantor, still the jury have pronounced upon the facts, and settled by their verdict that the conveyance was fraudulent, and it was therefore void as to existing creditors.

Another question is raised in this case: it is founded upon the exclusion of the testimony of Samuel Ward, the principal defendant and party to the record, and of his wife, Lucy Ward, whose depositions had been taken in favor of A. L. Ward, a co-defendant, and the alleged fraudulent alienee of Samuel Ward, the insolvent debtor. It is insisted in argument that the rule of evidence announced by this court in the case of Rogers & Oliver v. John M. Patterson, at the Galveston term, 1869, is carrying the principle of exclusion beyond its rational limits, as recognized by the more modern decisions. In Rogers & Oliver v. Patterson, it was announced that a party to the record was incompetent as a witness for his co-suitor ; that this was a common law rule —a rule which had obtained for a time *whereof the memory of man runneth not to the contrary.* Phillips on Evidence, volume 1, p. 29, says : "The general rule *formerly* was that a party to the record, in a civil suit, could not be a witness at the trial, for himself or for a joint suitor, against the adverse party." So says Mr. Starkie. Mr. Greenleaf, volume 1, section 329, says: "The general rule of the common law is that a party to the record, in a civil suit, cannot be a witness either for himself or for a co-suitor in in the cause." So says Mr. Blackstone. Mr. Greenleaf fur-

---

ther says, in volume 1, section 356 : " The mere pleading of any matter of personal discharge, (by a defendant, in actions *ex contractu,*) is not alone sufficient to render the party a competent witness; and it has been held that he is not entitled to a previous verdict upon that plea for the purpose of testifying for the others." Such is the law as it aforetime was—the common law rule upon the subject. Lord Denman's act for improving the law of evidence, of 6 and 7 Victoria, precluded such an innovation upon the rule of evidence as the rendering a party individually named in the record, to any suit, action or proceeding, competent to testify in the cause. The statute of Texas (December 20, 1836, Article 3706, Paschal's Digest,) declares : " The common law of England, as now practiced and understood, shall, in its application to juries and evidence, be followed and practiced by the courts of this Republic, so far as the same may not be inconsistent with this act, or any other law passed by this Congress." This court, therefore, as mere expounders of the law, and not its makers, can see no reason to qualify the announcement of the rule in the case Rogers & Oliver v. Patterson. The depositions of Samuel Ward and Lucy Ward, his wife, were therefore properly excluded. ·

Wherefore, the judgment of the district court is affirmed.

Affirmed.

DENISON, J., dissenting.—I respectfully dissent from the opinion of the majority of the court in this case.

There are three grounds, upon either of which I am of the opinion that the judgment below should be reversed.

First—It is a general rule of law, clearly indicated by the elementary writers, such as Kent and Story, and asserted in all the decisions of the courts of the United States (with one exception hereafter to be noticed), that a creditor cannot attack the voluntary conveyance of his debtor until he has first prosecuted his claim ·

to judgment, or, in other words, none but a judgment creditor is in a position to enable him to attack such conveyance. The only exception to this rule is in the case of Scott v. McMillen, cited in the opinion of the majority of the court. In the said cited case, the above general rule is fully sustained; but an exception to it is allowed on account of the peculiar laws of Kentucky, where the case was decided. These laws of Kentucky provide no means for obtaining judgment against a non-resident debtor, and consequently, on account of this defect in the law, a creditor not having judgment, was allowed to attack the voluntary conveyance of his debtor, who was a non-resident. This single exception to the general rule is rather confirmative of the general rule than derogatory thereto.

Second—I think it was erroneous in the court below to permit two distinct and separate actions to be carried on in the same suit. These two separate actions were, first, a suit attacking the validity of a voluntary conveyance, and a suit upon two foreign judgments. Each of these two suits was entirely different in its nature from the other, and the necessary parties defendant in each were different from those in the other. In the first case the necessary parties defendants were simply A. L. Ward, and Hughes, his assignee. In the second case the only necessary party defendant was Samuel Ward. As an evidence of the evil of prosecuting the two suits in one, the evidence of Samuel Ward, who was a disinterested and competent witness in the first above mentioned suit, was ruled out, and the defendants therein, deprived of the benefit thereof, simply because he was a party defendant in the conglomerate suit.

Third—It appears by the record that in the progress of the suit the attachment was quashed, thus leaving the court without jurisdiction in the matter, because it was only by the attachment that the court acquired jurisdiction in the case. It may be urged that this attachment was wrongfully quashed, but this is not so,

XXXIII—21

because the attachment was issued for the purpose of attacking the voluntary conveyance, without first having obtained judgment in accordance with the rule stated above. It is also said that this quashing of the attachment was too late in the progress of the suit. All that is to be answered in reference to this objection is that the attachment, being wrongfully issued, should have been quashed at any stage of the proceedings; and if not quashed at all by the court below upon motion, it would have been such error in the court below as would have warranted a reversal of the judgment. It may be further said that the levy of the attachment was void, and conferred no jurisdiction on the court, because the levy was upon the land as the property of Samuel Ward, when the record shows that the legal title to the land was vested in A. L. Ward and his assignee, and the equitable title thereof, if any existed, was not in him, Samuel Ward. The title, both legal and equitable, had departed from Samuel Ward, and he had no interest, either legal or equitable, therein. It is urged that unless some property of Samuel Ward had been levied upon under the attachment, the court acquired no jurisdiction over him by the attachment; therefore, no judgment could be rendered against him in this proceeding.

For these reasons I am clearly of the opinion that the judgment below should have been reversed.

Reversed.